IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ADVANCED MICRO DEVICES, INC, | ) CIVIL ACTION NO.   1:23- cv-304 |
| | ) |
| Plaintiff, | ) **JURY TRIAL DEMANDED** |
| | ) |
| v. | ) **FILED UNDER SEAL** |
| | ) |
| POLARIS INNOVATIONS LIMITED, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

Plaintiff Advanced Micro Devices, Inc., ("AMD" or "Plaintiff") brings this suit against Defendant Polaris Innovations Limited ("Polaris" or "Defendant") for breach of contract and tortious interference with a contractual relationship. AMD's claims arise from a patent license. In 2018, Polaris sued AMD in this District asserting infringement of two U.S. patents in a patent portfolio allegedly acquired from Infineon Technologies AG ("Infineon"). AMD raised a license defense in its Answer. Instead of seeking to resolve AMD's defense in this District, Polaris sued AMD in Germany in 2022 asserting similar patent infringement claims based on three German patents, DE 10 342 474 B4 ("the '474 Patent"), DE 10 331 607 B4 ("the '607 Patent"), and DE 10 2004 013 641 B4 ("the '641 Patent;" collectively, the "Asserted Patents"), which Polaris also purportedly acquired from the same Infineon portfolio.[1]

---

[1] Polaris's German lawsuits include (1) Munich District Court Case No. 44 O 8249/22, in which Polaris has asserted the '474 Patent and a hearing is scheduled for May 4, 2023 (the "'474 Action"); (2) Hamburg District Court Case No. 327 O 111/22, in which Polaris has asserted the '607 Patent and a hearing is scheduled for May 4, 2023 (the "'607 Action"); and (3) Munich District Court Case No. 21 O 6390/22, in which Polaris has asserted the '641 Patent and a hearing is scheduled for October 4, 2023 (the "'641 Action") (the '474 Action, the '607 Action and the '641 Action are collectively referred to as the "German Actions").

AMD has a license to the Asserted Patents in the German Actions under a joint development contract (the "Joint Development Agreement") between Infineon and ATI Technologies Inc. ("ATI"), a company that AMD acquired in 2006. Through filing and maintaining the German Actions, Polaris has failed to respect AMD's license, breached its agreement with Infineon, and tortiously interfered with AMD's contractual relationships and rights under the Joint Development Agreement, causing AMD injury. Further, hearings in two of the German Actions are scheduled for May 2023. If Polaris succeeds on any patent infringement claim in Germany, AMD will likely be enjoined from selling its accused products, which will cause AMD irreparable injury.

AMD alleges as follows:

## I.     PARTIES

1.     Plaintiff AMD is a corporation organized and existing under the laws of the State of Delaware. AMD maintains its principal place of business at 2485 Augustine Drive, Santa Clara, California 95054. AMD also maintains a place of business at 7171 Southwest Parkway, Austin, Texas 78735.

2.     Polaris is a limited company organized and existing under the laws of the Republic of Ireland with a principal place of business at 77 Camden Street, Dublin D02 XE60, Republic of Ireland.

## II.     JURISDICTION AND VENUE

3.     This Court has specific personal jurisdiction over Polaris based on events that occurred in this state relating to the causes of action and because Polaris has availed itself of this jurisdiction in another case involving the same parties.

4.     Polaris's breach of the rights and obligations of the agreements-at-issue gives rise to the instant action and conveys personal jurisdiction over Polaris. *See, e.g.*, Ex. 9 (Complaint for

Patent Infringement, DE 103 42 474, Munich Regional Court I, Patent Litigation Chamber, Case No. 44 O 8249/22 (July 15, 2022) (German)); Ex. 10 (Complaint for Patent Infringement, DE 103 31 607 B4, Hamburg Regional Civil Court, Chamber 27, Case No. 327 O 111/22 (June 1, 2022) (German)); Ex. 11 (Complaint for Patent Infringement, DE 10 2004 013 641, Munich Regional Court I, Patent Litigation Chamber, Case No. 21 O 6390/22 (June 1, 2022) (German)); Ex. 15 (Polaris Innovations Ltd. v. AMD, Case No. 1:18-cv-00555, D.I. 1 (W.D. Tex. July 2, 2018) (Complaint)); Ex. 21. This case involves two agreements: (1) the Joint Development Agreement granting AMD a license to the Asserted Patents, and (2) an agreement between Infineon and Polaris related to the purported acquisition of the Asserted Patents by Polaris from Infineon ("Polaris-Infineon Agreement"). Exs. 9-11, 15, 21.

5.     AMD's breach of contract and tortious interference claims directly relate to Polaris's activities in Texas. Upon information and belief, Polaris is a non-practicing entity that licenses—but does not practice—its patents. *See* Ex. 22-23; *see also* Ex. 24 at 6-7. Upon information and belief, Polaris breached the Polaris-Infineon Agreement by asserting that AMD infringes the Asserted Patents, which are part of a portfolio it obtained from Infineon (the "Portfolio"), and contending that AMD does not have a license to those patents. On multiple occasions, Polaris contacted AMD in Texas or met with AMD at AMD's offices in Texas to discuss the Portfolio, AMD's alleged infringement of patents in the Portfolio, and AMD's license rights. *See* Exs. 25-26. In particular, Polaris visited AMD's offices located at 7171 Southwest Parkway in Austin, Texas on multiple occasions from 2015-2017.

6.     Polaris has availed itself of this jurisdiction in another case involving the same parties, Case No. 1:18-cv-00555, when it filed a complaint against AMD for patent infringement ("Prior Action"). In that pending case, Polaris asserts that AMD allegedly infringes U.S. Patent

Nos. 6,728,144 (the "'144 Patent") and 8,117,526 (the "'526 Patent"), which—like the Asserted Patents—were allegedly assigned to Polaris by Infineon in 2015 under the Polaris-Infineon Agreement. *See* Ex. 15; Ex. 20.

7.      Polaris has also repeatedly availed itself of, and benefitted from, the judicial system in Texas. In addition to the Prior Action, Polaris has filed two other lawsuits in the Eastern District of Texas alleging patent infringement related to its Portfolio. Ex. 16 (*Polaris Innovations Ltd. v. Nanya Tech. Corp.*, Case No. 2:23-cv-00044, D.I. 1 (E.D. Tex. Feb. 6, 2023) (Complaint)); Ex. 17 (*Polaris Innovations Ltd. v. Broadcom, Inc.*, Case No. 2:22-cv-00347, D.I. 1 (E.D. Tex. Sept. 7, 2022) (Complaint)).

8.      This Court has jurisdiction over the subject matter under 28 U.S.C. § 1332.

9.      There is a diversity of citizenship between the parties.

10.     AMD is a citizen of Delaware and California because it is organized under Delaware law and it maintains its principal place of business in California. Further, AMD does business in Texas.

11.     Polaris is a citizen of Ireland because it is organized and exists under the laws of the Republic of Ireland and has its principal place of business at 77 Lower Camden Street, Dublin 2, D02 XE80, Republic of Ireland. Ex. 27 (Polaris Innovations Ltd, *Form B1C - 2022 Annual Return General* (Sep. 2022)) at 1; Ex. 28 (*Polaris v. AMD*, Case No. 1:18-cv-00555, D.I. 5 (W.D. Tex. July 2018) (Rule 7.1 Corporate Disclosure)); Ex. 29 (*Polaris v. Nanya*, Case No. 2:23-cv-00044, D.I. 4 (E.D. Tex. Sept. 2022) (Rule 7.1 Corporate Disclosure)); Ex. 30 (*Polaris v. Xilinx*, Case No. 1:22-cv-00174-RGA, D.I. 37 (D. Del. Sep. 2022) (Updated Rule 7.1 Corporate Disclosure)).

12.     Polaris is a wholly owned subsidiary of Wi-LAN Inc. Exs. 28-30. Wi-LAN Inc. is the sole member of Polaris and owns 100% of Polaris's shares. Ex. 27 at 5.

13.     Wi-LAN Inc. is a private non-distributing corporation. Ex. 31 (Wi-Lan Inc., *2022 Annual Report* (2022)).

14.     Wi-LAN Inc. is a citizen of Canada because it is organized and exists under the laws of Canada and has a principal place of business at 1891 Robertson Road, Suite 100, Ottawa, Ontario, K2H 5B7, Canada.   Ex. 32 (INNOVATION, SCIENCE, AND ECONOMIC DEVELOPMENT CANADA, CORPORATE PROFILE: WI-LAN INC. (2023)); Exs. 28-30.

15.     Wi-LAN is a wholly owned subsidiary of Quarterhill Inc.  Ex. 34 at 12; Ex. 35 at 4-5; Exs. 28-30. Quarterhill Inc. is a publicly traded corporation. Exs. 28-30.

16.     Quarterhill Inc. is a citizen of Canada because it is organized and exists under the laws of Canada and has a principal place of business at 25 King Street West, Suite 1101, Toronto, Ontario, M5L 2A1, Canada. Ex. 33 (INNOVATION, SCIENCE, AND ECONOMIC DEVELOPMENT CANADA, CORPORATE PROFILE: QUARTERHILL INC. (2023)); Exs. 28-30.

17.     On information and belief, the amount in controversy for the instant action substantially exceeds $75,000. For example, in Polaris's complaints in the German Actions, Polaris asserts that the value of each case is $2.5 million. Exs. 9-11; Ex. 12 (Machine Translation of Complaint for Patent Infringement, DE 103 42 474, Munich Regional Court I, Patent Litigation Chamber, Case No. 44 O 8249/22 (July 15, 2022) (English)); Ex. 13 (Machine Translation of Complaint for Patent Infringement, DE 103 31 607 B4, Hamburg Regional Civil Court, Chamber 27, Case No. 327 O 111/22 (June 1, 2022) (English)); Ex. 14 (Machine Translation of Complaint for Patent Infringement, DE 10 2004 013 641, Munich Regional Court I, Patent Litigation Chamber, Case No. 21 O 6390/22 (June 1, 2022) (English)).

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Polaris previously filed another case involving the same parties in this judicial district and because a substantial part of the events giving rise to the claims occurred and continue to occur in the Western District of Texas.

19.     Venue is also proper in this district under 28 U.S.C. § 1391(c)(3) because Polaris is a resident of Ireland.

### III.     BACKGROUND AND SUPPORTING FACTS

*A.     AMD and ATI*

#### i.     AMD

20.     AMD is an American semiconductor company and pioneer of leading-edge computing products focused on high-performance processing and graphics technology. Founded as a small, forward-thinking Silicon Valley startup in 1969, AMD came to Austin in 1979 and has since grown into a global company with 60 locations across the world. AMD's products include microprocessors (known as central processing units or CPUs), in addition to discrete or integrated circuits such as graphics processing units (GPUs) and chipsets (circuits for managing the flow of data between the microprocessor, memory, and computer peripherals).

21.     As of December 31, 2022, AMD had over 25,000 employees in its global workforce, including thousands of employees in the Austin area. Among other things, AMD has and continues to invest heavily and develop improvements in computing and visualization technology, including those related to computer memory, commonly known as dynamic random access memory (DRAM). It has done so by designing and bringing novel solutions to the marketplace. In addition, AMD's investment in innovation is exemplified, in part, by AMD's acquisition of companies, such as ATI Technologies Inc., to drive new levels of innovation.

### ii.    ATI

22.    ATI Technologies Inc. ("ATI") was a leader in the design and manufacture of innovative 3D graphics and digital media silicon solutions. ATI provided leading-edge solutions for the personal computing, workstation, digital television, game console, and handheld markets. From its inception, ATI made significant investments in the research and development of innovative computing solutions.

23.    ATI maintained two primary business units: one focused on personal computers ("PC Unit"), and the other on consumer electronics ("Consumer Electronics Unit"). *See* Ex. 36 (ATI Tech. Inc., *2005 Annual Report* (2005)) at 11, 61. ATI's PC Unit sold several types of products including, but not limited to, visual processing units (VPUs) for desktop and laptop computers under the RADEON brand. *See* Ex. 36 at 11 ("all 3D graphics, video and multimedia products, and chipsets developed for use in desktop and notebook computers, including professional workstations, servers and home media PCs"). ATI's Consumer Electronics Unit sold chips for digital televisions (TVs) under the XILLEON and THEATER brands, handsets under the IMAGEON brand, and game consoles with the FLIPPER product used in the Nintendo Gamecube, among other products. *See* Ex. 36 at 11 ("products used in mobile phones, PDAs, DTVs and consumer electronics, as well as royalties and contract engineering services derived from mobile phone and game console products."); Ex. 37 at 5, 11-12, 17.

### iii.    AMD's Acquisition of ATI

24.    Recognizing ATI's value as an industry leader in innovation and collaboration, AMD acquired ATI and all of its business units on October 25, 2006 for approximately $5.4 billion. Through this acquisition, AMD hoped to drive "innovation, choice and growth in the technology industry." *See, e.g.*, Ex. 40 at 1. Accordingly, ATI was assimilated into "the new

AMD" that "merge[d] AMD's technology leadership in microprocessors together with ATI's leadership in graphics, chipsets, and consumer electronics" to provide "a full range of intellectual property (IP) in microprocessors, graphics, chipsets and consumer electronics to deliver open platforms and integrated solutions." Ex. 40 at 1. This integration of ATI's PC and Consumer Electronics Units garnered widespread praise in the industry. *See* Ex. 39.

25.    Since its acquisition of ATI's PC and Consumer Electronics Units, AMD has continued to expend substantial resources researching, developing, and delivering such platforms and solutions, including by fulfilling ATI's contractual obligations with other business entities in its pursuit of industry collaboration and innovation. Ex. 42 at 23 (addressing "successful integration of ATI's operations" and "invest[ing] in research and development related to [AMD's] graphics and chipset products and products for consumer electronics devices, including new integrated platforms and our design initiative called 'Fusion'"). In fact, these same business units were described in AMD's financial disclosure after the acquisition of ATI:

> As a result of our acquisition of ATI in October 2006, we began to supply 3D graphics, video and multimedia products and chipsets for desktop and notebook PCs, professional workstations, and servers as well as products for consumer electronic devices such as mobile phones, digital TVs and game consoles. Therefore, since this acquisition, we have actively participated in the semiconductor graphics and chipset markets as well as in the semiconductor market for consumer electronics devices.

Ex. 42 at 3; *see also* Ex. 41 at 5; Ex. 43 at 50-51.

### B.    *Infineon and Qimonda*

26.    Infineon was founded in 1999, and by the early 2000s provided a "broad range of semiconductor products for the communications, automotive and memory markets." Ex. 93. Infineon spun off its memory business unit in early 2006 into a separate company called Qimonda. *See, e.g.*, Ex. 48 at 4; *see al*so Ex. 49. Infineon assigned Qimonda the rights to memory-related

intellectual property as part of this spinoff, including the rights to the Asserted Patents. *See, e.g.*, Ex. 48 at 4; *see al*so Ex. 49.

27.    During and following the carveout, Qimonda took over Infineon's preexisting obligations and business endeavors in the memory space. Ex. 49 at 1-2 (describing Qimonda's future vision to be "a leading creative memory products company" and Infineon's targeting, *inter alia*, "semiconductor solutions for reducing energy consumption"). ████████████████████ ████████████████████████████████████████

28.    However, Qimonda declared bankruptcy in 2009, and Infineon reacquired the Asserted Patents during the bankruptcy proceedings in October 2014. *See, e.g.*, Ex. 75.

## C.    Collaboration On Previous JEDEC Standards

29.    ATI was a driver of innovation in the field of memory systems, which typically include a circuit connected to one or more memory devices for managing the flow of data to and from the memory. That circuit was commonly known as a memory controller and was often incorporated into other integrated circuits in the computer system, such as the central processing unit (CPU), graphics processing unit (GPU), or chipset.

30.    One way in which ATI drove innovation was by leading collaborative efforts with memory device companies, such as Infineon and Hynix, to develop the world's leading-edge computer memory systems. Historically, companies like ATI that designed and manufactured memory controllers did not also design and manufacture memory devices, but instead worked with memory-device companies to research and develop memory standards to facilitate industry-wide adoption.

31.    By of the end of 2002, ATI had worked successfully with Infineon and other memory companies to develop the third generation of a memory specification for graphics double data rate (DDR) dynamic random access memory (DRAM). *See* Ex. 44; Ex. 38 ("ATI worked with

major memory manufacturers to bring the GDDR3 spec to fruition[.]"). To achieve this milestone, ATI led a collaborative effort with several memory device companies—including Micron, Infineon, Elpida, and Hynix—to improve upon the DDR2 and DDR-400 standards developed and published by JEDEC, a preeminent memory standards body. Ex. 38. Although the memory specification was initially developed for use in graphics applications, resulting in the name GDDR3, the developments reflected in GDDR3 were expected to migrate to a broad range of applications.

32.     While GDDR3 was widely adopted, a later-developed graphics specification, GDDR4, was not widely adopted by DRAM manufacturers and was not employed by Infineon. *See* Ex. 45-47.

### D.     *Joint Development Agreement*

33.     Against this backdrop of collaboration and challenges, ATI executed the Joint Development Agreement with Infineon ███████████████. *See* Ex. 1 (███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ Both ATI and Infineon owned and had knowledge of background technical information to contribute to this collaborative effort. This information included intellectual property such as the Asserted Patents.

34.     ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

35.    Accordingly, the Joint Development Agreement concerned a collaborative project

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ *see also* Section III.B in Appendix

A (for the '474 Patent), Appendix B (for the '607 Patent), and Appendix C (for the '641 Patent).

36.    The Joint Development Agreement grants a ████████████████████████

████████ license ███████████████████████████████████ covered by

defined terms in the contract. *See* Ex. 1 ██████████; *see, also infra* § ████.

**i.    Assignment to Qimonda and AMD**

37.    In 2006, after ATI and Infineon entered into the Joint Development Agreement,

AMD took over ATI's obligations ████████████████, and Qimonda took over Infineon's

obligations ████████████████████████. AMD and Qimonda each performed under the Joint

Development Agreement by working together collaboratively with direct interactions and

interactions ████████████████████████████. *See* Ex. 2 ████████████████████

██████████████████████████.

38.    █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

39.    Under California law, ████████████████████████████████████████
████████████, the assignment of rights and obligations need not be written. *Berg Metals Corp. v. Wilson*, 170 Cal. App. 2d 559, 575–76 (Cal. Dist. Ct. App. 1959) ("[A]n oral assignment of a contract . . . is sufficient."); *see also G & W Warren's, Inc. v. Dabney*, 218 Cal. Rptr. 3d 75, 82–83 (Cal. Ct. App. 2017) (finding an oral assignment was sufficient for a contractual assignment provision). Courts may imply an assignment based on the conduct of one or more parties. *See Greco v. Or. Mut. Fire Ins. Co.*, 12 Cal. Rptr. 802, 807 (Ct. App. 1961); *see also Norton v. Consol. Fisheries, Inc.*, 260 P.2d 617, 620 (Ct. App. 1953) (recognizing that evidence from one witness is sufficient to prove an oral assignment).

40.    There was an implied assignment between ATI and AMD based on the conduct of the parties. For example, AMD announced when it acquired ATI that it would continue to research and develop products related to ATI's PC and Consumer Electronics Units. Ex. 42 at 23; *supra* § III.A.iii. And after the acquisition, AMD stated that it had "actively participated" in the "semiconductor graphics," "chipset," and "consumer electronics" markets that ATI's business units had previously participated in. Exs. 41-43.

41.    AMD's actions after its acquisition further indicate that ATI's rights and obligations under the Joint Development Agreement were assigned to AMD. Relying on the benefits of the Joint Development Agreement, AMD expended significant time, money, and resources to perform its duties under the Joint Development Agreement ████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██

42. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

43. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

44. AMD also worked together collaboratively with Qimonda, ████████████
████████████, to continue the research and development ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

45.    ██████████████████████████████████, Qimonda announced in November 2007 that it had shipped its first samples related to GDDR5 and won AMD as a launch partner for GDDR5 memory. *See, e.g.*, Ex. 72; Ex. 73. In this announcement, Qimonda noted that GDDR5 was "targeted to become the next predominant graphics DRAM standard," and that "industry participants jointly defined" the standard at JEDEC for several years. Ex. 72.

46.    Qimonda expressed excitement to be working with "a leading manufacturer of memory products," and Robert Feurle (Qimonda's Vice President of Business Unit Graphics) declared that "[Qimonda is] very proud to supply AMD with GDDR5." Ex. 72. This excitement was shared by AMD, with Joe Macri (then Senior Director at AMD) declaring that Qimonda's "strong GDDR5 roadmap convinced [AMD] to choose them as a primary partner." *Id.*

47.    Shortly after Qimonda's announcement, AMD launched the world's first product featuring GDDR5 memory from Qimonda on June 25, 2008. Ex. 74.

48.    Following the successful rollout of products by both Qimonda and AMD, ██ ████████████████████████████████████████████████ ████████████████.

E.    ***Content and Definitions of Joint Development Agreement***

49.    In return for performing their obligations ██████████████████████ ████████████████████████████████████████████and ████████████████ AMD and Qimonda—were each granted license rights ████████████████████ ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████

████████████████████████

50.     ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████

51.     ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

52.     ██████████████████████████████████████████

██████████████████████████████████████████████

█████████████████

*F.*     *License to Asserted Patents*

53.     ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

54.    The products accused of allegedly infringing the Asserted Patents are covered under

the license grant ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

55.    The Joint Development Agreement grants AMD a license ███████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████

56.    ██████████████████████████████████████████████

████████████████████████████████

**G.    *Polaris's Alleged Acquisition of the Asserted Patents and Knowledge of AMD's License Rights under the Joint Development Agreement***

57.    In 2015, Infineon allegedly assigned the Asserted Patents to Polaris. *See Original Complaint for Patent Infringement*, Case No. 1:18-cv-00555, D.I. 1 (July 2, 2018); Ex. 20.

58.    Upon information and belief, before Polaris allegedly acquired rights in the Asserted Patents, Polaris had the opportunity to review, and did review as part of its due diligence, the Joint Development Agreement, among other agreements. Upon information and belief, Polaris executed the Polaris-Infineon Agreement after having reviewed the Joint Development Agreement and being aware of its obligations to licensees, such as AMD.

59.    Upon information and belief, Polaris has also been aware of AMD's assertion of its rights at least since AMD asserted a license defense to Polaris's patent infringement claims in Case No. 1:18-cv-00555 in this District. *See* Ex. 18 (*Polaris Innovations Ltd. v. AMD*, Case No. 1:18-cv-00555, D.I. 40 (W.D. Tex. Aug. 2019) (Defendant Advanced Micro Devices, Inc.'s Answer, Defenses, and Counterclaims to Plaintiff's Original Complaint)) at 9.

60.    Polaris initiated the German Actions in June and July 2022 against AMD and Advanced Micro Devices GmbH despite being aware of AMD's license rights. Polaris also specified AMD customers as allegedly infringing the Asserted Patents by using AMD products.

61.    In response, AMD asserted, among other things, a license defense based on the Joint Development Agreement and has since provided Polaris a copy of the Joint Development Agreement as notice that AMD is a licensee of the Asserted Patents. Despite being aware of AMD's license defense, Polaris has continued to pursue its German Actions and has failed to respect AMD's license, causing AMD to incur significant losses in legal expenses, costs, and employee time.

## IV.    CAUSES OF ACTION

### COUNT 1

### Third-Party Beneficiary Breach of Contract – Polaris-Infineon Agreement

62.    AMD repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

63.     Infineon allegedly assigned the Asserted Patents to Polaris pursuant to the terms of an agreement between Infineon and Polaris (the Polaris-Infineon Agreement). *See, e.g.*, Ex. 9 at 10–14; Ex. 10 at 11–15; Ex. 11 at 12–16; Ex. 12 at 11–15; Ex. 13 at 12–16; Ex. 14 at 13–17. Polaris purportedly acquired from Infineon the vast majority of Qimonda AG's patent portfolio, including over 7,000 patents and applications related to technologies for DRAMs and memory interfaces, among other things. Ex. 19. In exchange for acquiring the patent portfolio, approximately $33 million was purportedly paid to Infineon. *Id.* Further, patent assignments were recorded with the German patent office and with the U.S. patent office. *See* Exhibits 9-14 at 8.

64.     Upon information and belief, the Polaris-Infineon Agreement is a valid and enforceable contract. Indeed, Polaris has relied on the Polaris-Infineon Agreement in its German Actions to support its claim that Polaris acquired the Asserted Patents from Infineon. *See, e.g.*, Ex. 9 at 10–14; Ex. 10 at 11–15; Ex. 11 at 12-16; Ex. 12 at 11–15; Ex. 13 at 12-16; Ex. 14 at 13-17.

65.     Upon information and belief, Polaris has an obligation under the Polaris-Infineon Agreement to respect and uphold license rights to the patents it purports to have acquired from Infineon.

66.     These license rights include license rights granted to AMD though the Joint Development Agreement.

67.     Upon information and belief, Polaris was aware of the license set forth in the Joint Development Agreement before it allegedly acquired the Asserted Patents.

68.     Further, AMD has asserted to Polaris on multiple occasions that it has license rights under the Joint Development Agreement in the patents that Polaris purports to have acquired from Infineon, including the Asserted Patents. *See supra* § ▇. AMD asserted a license defense in

another case in this District involving the same parties, Case No. 1:18-cv-00555. *Id*. In each of the German Actions, AMD has asserted a right to use the Asserted Patents. *Id*. Moreover, on information and belief, Polaris had an opportunity to review the Joint Development Agreement before entering into the Polaris-Infineon Agreement as part of its due diligence.

69.     Upon information and belief, the provisions of the Polaris-Infineon Agreement requiring Polaris to respect and uphold any license rights to the patents Polaris purports to have acquired from Infineon were intended to directly and immediately benefit licensees, such as AMD, who may rely on such licenses and expend significant resources in researching, developing, and manufacturing technologies based on patent rights.

70.     AMD is a licensee of the Asserted Patents under the Joint Development Agreement. *See generally supra* § III.E. ████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████. AMD obtained a license to the Asserted Patents when it acquired ATI and performed ATI's research and development obligations under the Joint Development Agreement with Qimonda. *See supra* ¶¶ 41–43. The Asserted Patents are still subject to a valid license to AMD ████████████

██████████████████████████████████████████

71.     Upon information and belief, Polaris breached its obligation to respect and uphold license rights under the Polaris-Infineon Agreement by suing AMD in Germany for allegedly infringing the Asserted Patents: DE10342474, DE10331607, and DE102004013641.

72.     Upon information and belief, as a licensee of the Asserted Patents, AMD is an intended third-party beneficiary of the Polaris-Infineon Agreement that has the right to sue for

Polaris's breach of its obligations to respect and uphold any license rights to the patents Polaris purportedly acquired from Infineon.

73.    Despite its knowledge of AMD's license under the Joint Development Agreement, Polaris has maintained its claims against AMD in Germany, causing AMD to incur significant losses in legal expenses, costs, employee time, and discovery-related expenses to defend against Polaris's meritless lawsuits.

74.    In addition, Polaris has sought an injunction in the lawsuits brought in Germany. Two of the lawsuits are scheduled for hearings on May 4, 2023. "German courts hand down injunctions in virtually each and every case of patent infringement." Ex. 76 (Martin Stierle & Franz Hofmann, *The Latest Amendment to the German Law on Patent Injunctions: The New Statutory Disproportionality Exception and Third-Party Interests*, 71 GRUR INT'L 1123 (2022)) at 1123, 1127 (Even after the passage of the new statutory disproportionality exception, "the grant of an injunction will continue to be the general rule and the denial of an injunction will form a rare exception in practice."). As a result of Polaris's actions, AMD has been threatened with reputational harm with its customers should an injunction be granted by a German court. *See* Ex. 3; Ex. 4 .

## COUNT II

### Tortious Interference with Contractual Relationship

75.    AMD repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

76.    To establish a claim for tortious interference with a contract, a plaintiff must establish (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract (or relatedly, that the defendant knew of the contract,

defendant's intentional acts designed to induce a breach or disruption of the contractual relationship, and the acts caused an actual breach or disruption of the contractual relationship); (3) that the interference proximately caused the plaintiff's injury; and (4) Plaintiff incurred actual damage or loss. *See, e.g.*, *Community Health Systems Professional Services v. Hansen*, 525 S.W.3d 671 (Tex. 2017); *see also Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 56, 77 Cal.Rptr.2d 709, 960 P.2d 513 (Cal. 1998); *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148, 95 P.3d 513, 517 (Cal. 2004).



77.    The license provisions of the Joint Development Agreement are a valid contract subject to interference, executed by ATI and Infineon. ███████████████████ The rights and responsibilities under the Joint Development Agreement transferred from ATI to AMD and AMD continued to collaborate with Qimonda ██████████████████████ ██████y.

78.    When AMD acquired ATI, AMD became the party responsible for ATI's obligations under the Joint Development Agreement. Accordingly, AMD also became the licensee ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████

79.    The assertion of infringement of ████████████████████ ████████████████████████████████████████ ████████████████████████████████

80.    Polaris willfully and intentionally interfered with the Joint Development Agreement. Upon information and belief, Polaris had several opportunities to review the Joint

Development Agreement and therefore, knew of the existence of this contract between AMD and Qimonda/ Infineon. *See supra* § ███. Thus, upon information and belief, Polaris knew that AMD had a license to ███████████████████ the Asserted Patents, under ██████████ of the Joint Development Agreement. Polaris knew or should have known that the license rights granted under the Joint Development Agreement by Infineon/Qimonda and therefore any rights that Polaris acquired in the Asserted Patents are subject to AMD's license. *See, e.g.*, *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008) (explaining that there is a general proposition that "because the owner of a patent cannot transfer an interest greater than that which it possesses, an assignee takes a patent subject to the legal encumbrances thereon," but these legal encumbrances that "run with the patent" in a patent license agreement do not extent to a duty to arbitrate); *see also Medtronic AVE Inc. v. Advanced Cardiovascular Sys.*, 247 F.3d 44, 60 (3d. Cir. 2001). Upon information and belief, because Polaris knew of the existence of and the responsibilities under this Joint Development Agreement, Polaris knew that AMD's rights under the Joint Development Agreement would be disrupted by Polaris's filing of the related patent infringement litigations.

81.     Upon information and belief, Polaris reviewed the Joint Development Agreement and its terms before allegedly purchasing the Asserted Patents from Infineon.

82.     Upon information and belief, Polaris reviewed the Joint Development Agreement again when AMD asserted a license defense to Polaris's patent infringement claims in this district. *See* Ex. 18 at 9; *supra* ¶ 59.

83.     Upon information and belief, even after AMD alleged a license defense in this District, Polaris interfered with AMD's contractual rights to enjoy its license under ████████████ ████████████████ the Joint Developed Agreement. *See supra* § III.F. Upon information and

belief, despite reviewing the licensing provisions of the Joint Development Agreement, Polaris actively interfered with AMD's rights under the Joint Development Agreement by continuing to file and pursue the German Actions against AMD for allegedly infringing patents that AMD is licensed to use.

84.     Upon information and belief, Polaris viewed the Joint Development Agreement yet another time during the German Actions, but Polaris continued to refuse to accept AMD's license rights and maintain the German Actions.

85.     When Polaris filed the complaints to the German Actions despite knowing the responsibilities required by the Joint Development Agreement to which AMD was ▮ ████████████████████████ a party, Polaris intentionally induced the disruption of the contractual relationship between AMD and Infineon/Qimonda. This caused an actual disruption of the contractual relationship; instead of the permissive use of the patents licensed under the Joint Development Agreement to further develop the memory technology, AMD is now forced to needlessly litigate in a foreign country against Polaris.

86.     Polaris's actions caused AMD injury. Because Polaris continues to maintain its suits in Germany and is unwilling to recognize AMD's license under the Joint Development Agreement, AMD is unable to exercise its rights to ████████████████████████ ███ the Asserted Patents, ███████████████████████████████ ████████████████████████

87.     Due to Polaris's interference with AMD's contractual relationship with Infineon/Qimonda under the Joint Development Agreement by filing Polaris's suit in Germany, AMD has suffered actual damages. AMD has had to expend resources and money in litigating in

Germany. As a result of Polaris's actions, AMD is further threatened with reputational harm with its customers should an injunction be granted by a German court. *See* Exs. 3-4.

## V.    JURY DEMAND

88.    Plaintiff hereby demands a trial by jury.

## PRAYER

WHEREFORE, Plaintiff prays for judgment in their favor on all counts in the Complaint and requests relief as follows:

A.    That the Joint Development Agreement is a valid contract and that Plaintiff has a license to the Asserted Patents for Plaintiff's products accused of patent infringement by Polaris;

B.    That the Polaris-Infineon Agreement is a valid contract and that Polaris be found to be in breach of the Polaris-Infineon Agreement;

C.    That Polaris be found to be having committed tortious interference;

D.    That AMD be awarded damages for all claims for which such damages are authorized;

E.    That AMD be awarded attorney fees;

F.    That AMD be awarded a temporary restraining order and an anti-suit injunction ordering Polaris not to take any further action in filing, pursuing, or maintaining its patent infringement claims in Germany and elsewhere, including the German Actions as requested in the accompanying application for temporary restraining order and anti-suit injunction; and

G.    That AMD be awarded further relief as the Court deems equitable and just.

Dated: March 20, 2023                    Respectfully submitted,

By:  *Syed K. Fareed*

Syed K. Fareed
Texas Bar No. 24065216
Kevin J. Meek
Texas Bar No. 13899600
Aashish Kapadia
Texas Bar No. 24097917
**MCDERMOTT WILL & EMERY LLP**
303 Colorado Street, Suite 2200
Austin, Texas 78701-4078
Telephone: (512) 726-2600
Facsimile: (512) 532-0002
sfareed@mwe.com
kmeek@mwe.com
akapadia@mwe.com

Douglas H. Carsten (*pro hac vice pending*)
California Bar No. 198467
**MCDERMOTT WILL & EMERY LLP**
18565 Jamboree Road, Ste 250
Irvine, CA 92612-2565
Telephone:  (949) 851-0633
Facsimile: (949) 851-9348
dcarsten@mwe.com

Cecilia Choy, Ph.D. (*pro hac vice pending*)
California Bar No. 331172
**MCDERMOTT WILL & EMERY LLP**
650 Live Oak Avenue, Ste 300
Menlo Park, CA  94025-4885
Telephone: (650) 815-7400
Facsimile: (650) 815-7401
cchoy@mwe.com

***ATTORNEYS FOR PLAINTIFF***
***ADVANCED MICRO DEVICES, INC.***